946 So.2d 654 (2006)
STATE of Louisiana
v.
Leslie Otto ORDODI.
No. 2006-K-0207.
Supreme Court of Louisiana.
November 29, 2006.
Rehearing Denied February 2, 2007.
*655 Charles C. Foti, Jr., Attorney General, J. Phil Haney, District Attorney, Jeffrey J. Trosclair, Assistant District Attorney, for Applicant.
Richard A. Spears, New Iberia, for Respondent.
TRAYLOR, Justice.
Leslie Otto Ordodi was charged by bill of information with two counts of attempted armed robbery in violation of La. R.S. 14:64 and La. R.S. 14:27. After trial, the jury found the defendant guilty on both counts. The trial judge sentenced the defendant to concurrent terms of three years imprisonment at hard labor. Ordodi appealed, contending that the evidence was insufficient to support his convictions. The court of appeal, with one judge concurring, reversed his conviction and sentence. State v. Ordodi, 2005-522 (La.App. 3 Cir. 11/2/05), 916 So.2d 439. Upon the state's application, we granted certiorari to review the correctness of that decision. State v. Ordodi, 2006-207 (La.6/23/06), 930 So.2d 990.

FACTS
The following evidence was adduced at trial. Thelma Broussard, a former employee of Regions Bank in New Iberia, Louisiana, was at Regions Bank to do some banking on the morning of May 28, 2004. From where she sat at the customer service desk and spoke to Marla Hebert, a customer service representative, Ms. Broussard faced the street to the side of the bank. From her vantage point, Ms. Broussard observed a man, whom she later identified as the defendant, walking toward the bank pull a gun from a plastic bag and place the gun in his right pants pocket. Ordodi was wearing dark glasses. Ms. Broussard informed Ms. Hebert about what she had seen and left the bank.
Because she was concerned about the bank's employees, Ms. Broussard walked from where her car was parked near the drive-through windows to the other side of the bank. Looking in the window, Ms. Broussard saw the defendant talking to Ms. Hebert with a pamphlet in his hand. She stayed in that location until she saw the defendant leave the bank and enter his truck. Before returning to her car, she re-entered the bank and asked whether the man had been trying to open an account. When the bank employees told her "yes," she left the bank to go to a nearby grocery store.
*656 As Ms. Broussard traveled to the grocery store, she saw the defendant's truck parked in the parking lot of Bank One, another bank located further down on the same street. Ms. Broussard returned to Regions Bank, where Ms. Hebert was on the telephone with the police. Ms. Broussard informed Ms. Hebert that the defendant's truck was now parked at Bank One.
Marella Guidry was employed as a teller at Regions Bank that morning. At approximately 10:30 a.m., the bank was busy with customers. Ms. Guidry saw a customer looking around and asked him if he needed help. When the man mentioned something about an account, she asked if he wanted any brochures and he indicated he did not. She asked him if he wanted to speak to someone and he indicated, "Yes." When Ms. Guidry asked his name, the man hesitated a little and then walked over to ask her to repeat her question. Ms. Guidry again asked him his name so that she could introduce him to a customer service representative. The man responded that his name was "Roy," and then walked over to the person in charge of opening accounts, Ms. Hebert.
Ms. Guidry described the customer as wearing a cap and dark glasses. Ms. Guidry testified that the customer did not pull out a gun or hand her a note demanding money. The customer did not make any verbal demand for money. The only thing about which the customer inquired was opening an account. A security recording of the bank lobby that morning reflects the presence of other bank customers during the time the defendant was in the Regions bank and the defendant's appearance.
Marla Hebert confirmed that Ms. Broussard told her about the man putting a gun in his pocket when the two women were sitting at her desk in the bank's lobby. She turned around to look out of the window and saw a truck with the engine still running and a man walking down the sidewalk. Ms. Hebert observed the man enter the bank and stand in the teller line, waiting for a teller to help him. She saw the man have a conversation with Ms. Guidry and Ms. Guidry gesturing toward her desk.
When the customer approached Ms. Hebert's desk, she asked him to have a seat but the man continued to stand. The customer was wearing a baseball cap and dark colored sunglasses which prevented Ms. Hebert from being able to identify him as the defendant. While Ms. Hebert asked the customer questions prior to opening an account, the man kept putting his hands in and out of his pockets. The customer interrupted Ms. Hebert in the middle of a question to tell her he was not ready to open a new account and that he would return at a later time. The man then took a brochure and left.
After the man left the bank, Ms. Hebert called the main office for advice on what she should do, as she found the man's behavior odd. She was advised to call 911, which she did immediately thereafter. Ms. Hebert was still on the phone with the police when Ms. Broussard returned a second time to tell them the same truck which the armed man drove was now parked by Bank One. Ms. Hebert informed the police of that fact. Ms. Hebert stated that personnel at the main office called other area banks to inform them about the armed man.
Shelly Hughes was working at Bank One that morning. A customer, whom she later identified as the defendant, entered the lobby of the bank wearing a cap and dark sunglasses. She asked the defendant if she could help him with anything. The defendant told her that he would like to open a checking account. Ms. Hughes asked the defendant if he had any identification. When he said that he did, Ms. *657 Hughes asked him to wait in a chair because there was another customer ahead of him. A security recording of Bank One's lobby shows the defendant sitting in the chair waiting and the presence of other bank customers.
Ms. Hughes said that the defendant sat in the chair but then saw him walk to a desk where a bank representative was sitting. Ms. Hughes subsequently saw the defendant leave the bank. She said that the defendant seemed nervous and fidgety, as though he did not have the time to wait. As soon as the defendant left the bank, Ms. Hughes saw the authorities immediately confront the defendant in front of the bank's door.
Ms. Hughes testified the defendant never demanded money from her, never produced a gun while he was in the bank, and never reached over any teller's counter to grab for money. Ms. Hughes confirmed that the defendant only inquired about a checking account.
Tiffany Thibodeaux handled new accounts at Bank One. She heard Ms. Hughes tell a customer, whom she later identified as the defendant, that he needed to speak with her for a new account. She called the defendant over to her desk after she finished with a customer. The defendant, who was wearing a baseball cap and dark sunglasses, told Ms. Thibodeaux that he was interested in opening a checking account but just wanted a brochure.
Even so, Ms. Thibodeaux began to ask the defendant different questions regarding his banking needs. She stated the defendant was very short with his answers and did not talk much but just kept asking for a brochure. However, he answered questions regarding his home ownership and whether he had any other bank accounts. He told Ms. Thibodeaux that his name was "Roy." According to Ms. Thibodeaux, the defendant appeared very fidgety, as though he was in a hurry or did not have time to sit and talk. When Ms. Thibodeaux finished with her questions, she recommended a product and got up to obtain a brochure. She then walked back to her desk, handed the brochure to the defendant, shook his hand and walked him to the door.
After the defendant left the bank, another teller told Ms. Thibodeaux to lock the door. After she did so, Ms. Thibodeaux saw all of the police officers outside and the defendant on his knees.[1]
Kevin Bourque, Greg Pete and James Altman were employed as police officers by the New Iberia City Police on May 28, 2004. They responded to a call from Regions Bank and were on their way to that location when they received the call that the person for whom they were looking had moved on to Bank One. The officers were met outside Bank One by one of the tellers, who informed them that the defendant was inside but had not made any threats. The teller told the police that Bank One had been alerted about the defendant by another bank.
When the defendant walked out of Bank One, the officers confronted him with weapons drawn, requesting that the defendant put up his hands. After the defendant was handcuffed, the officers searched him. In the defendant's pockets, the police found an empty grocery bag and a revolver.
*658 Investigation revealed that Ordodi's truck was still running in the parking lot of Bank One with the keys inside. The license plate of the defendant's truck had been removed. The license plate, the screws which had held the license plate onto the bumper of the truck, and the wrench used to remove the license plate were found on the front seat of the truck. A spent .38 caliber shell casing was found in the weapon recovered from the defendant, as well as four live rounds of .38 caliber ammunition. In addition, the state presented evidence of a newspaper notice dated about ten days after the defendant's arrest which showed that the defendant's house had been seized and was for sale.
A video recording of Ordodi's interrogation showed Ordodi professed he had no idea why the police arrested him. He continually stated that he had done nothing wrong. He told the detective that he went into both banks looking for a free checking account because his current account charged a monthly fee and he was shopping around for the best deal.
The defendant claimed he had removed his license plate from the bumper but initially had no explanation for why he had done so. He later claimed he removed the license plate from the bumper in order to "look cool" and that the license plate had been in the back window of his truck. When the detective pointed out to him that the license plate was on the seat of his truck, he claimed the license had fallen down. He could not remember when he removed his license plate, but supposed it had been removed for a couple of months. Even when the detective, using an investigative tactic, told Ordodi someone had seen him remove the license that day, the defendant maintained he could not remember when the license plate was removed. Ordodi claimed the wrench found on the truck's front seat was for his truck battery even though the detective pointed out that the wrench was the proper size for the screws which had held the license plate onto his bumper.
Ordodi claimed he carried a gun with him into the bank for security reasons and that his brother-in-law had given him the weapon. He told the detective that he had been robbed when he was an 11 year old paper boy. He admitted he did not have a concealed handgun permit but stated he usually carried a gun when he went to the bank. The defendant claimed he placed the gun in his pocket at home and, if anyone said differently, they were lying. However, after being asked to think again about when he armed himself, he stated he may have placed the gun in his pocket prior to entering Regions Bank.
The defendant did not recall that he was carrying a plastic bag. When told that a plastic bag had been found in his pocket, he claimed he may have put a bag in his pocket after shopping the night before although he could not articulate a reason why he would have done so. The store which the defendant claimed to have visited the night before was not the name of the store on the bag found in his pocket.
Ordodi told the investigator that he normally left his truck engine running when he did small errands. He claimed that, if he turned his truck off, the truck would stop running altogether. He stated there was a problem with the truck's engine which drained the batteries.
Ordodi admitted to the investigator that he was in a financial bind but refused to discuss the matter further with him. He told the investigator that, had he intended to rob a bank, he would have done so.
The defense presented the testimony of Andrea Ordodi, the defendant's ex-wife. Ms. Ordodi brought to court a work shirt of the defendant's which had the name *659 "Roy" on it, although she testified that she personally did not call him by that name nor did her family. She could not say whether the defendant was called by that name at work.
Ms. Ordodi testified that the defendant's truck had mechanical problems. The defendant used to leave the truck running when he ran errands. If he turned off the engine, the truck might not start and he would be left stranded.
Ms. Ordodi had no personal knowledge of whether her ex-husband habitually carried a weapon with him when he did banking errands. After questioning, she recalled that the defendant told her about being robbed when he was a paper boy. Ms. Ordodi identified the weapon seized from the defendant as one which had been given to her by her brother.
Ms. Ordodi acknowledged that she and the defendant separated four years prior to her testimony and that the separation was a traumatic experience for him. In addition, she related that the defendant was laid off from his job and suffered from illness. She noted that these experiences left the defendant depressed.
The defense pointedly questioned the police witnesses about the misdemeanor crime of carrying a concealed weapon. In closing argument, the defense maintained that the defendant was guilty, at the most, of carrying a concealed weapon. The state, however, argued the totality of the circumstances established that the defendant committed an attempted armed robbery in that he had the specific intent to commit armed robbery and had performed various actions in furtherance of that intent.
The jury found the defendant guilty of both counts of attempted armed robbery. After the trial judge denied the defendant's motion for post-judgment verdict of acquittal, the trial judge sentenced him to concurrent terms of three years at hard labor, with credit for time served. Finding that the defendant had committed crimes of violence under La. R.S. 14:2(13), the trial judge denied the defendant any diminution of sentence for good behavior.
The defendant appealed his convictions, asserting in his sole assignment of error that the evidence failed to establish his guilt beyond a reasonable doubt. Specifically, the defendant argued the evidence was insufficient to show he had the specific intent to commit either armed robbery. Further, the defendant claimed that, even if the required intent was proven, the evidence was not sufficient to show that he acted in furtherance of that intent.
After reviewing the essentially uncontested facts of this matter, the court of appeal majority determined that the defendant's actions were not sufficient to constitute specific intent to commit armed robbery. Ordodi, 2005-522 p. 7, 916 So.2d at 443. Even assuming specific intent could be found, the court of appeal majority additionally found that the defendant's actions could not be characterized as being in furtherance of the commission of the offense, but were actions in mere preparation. "Acts in furtherance of the offense of armed robbery require more than that which is before us in this case." Id. The court of appeal majority based its conclusion of evidentiary insufficiency on the fact that the defendant failed to initiate some manner of threatening action toward his intended victims and never demanded anything of value from anyone. Ordodi, 2005-522 p. 8, 916 So.2d at 444. The court of appeal reversed the defendant's conviction and sentence.
In a concurring opinion, Judge Saunders found the defendant's actions constituted specific intent to commit armed robbery. *660 However, Judge Saunders agreed that the defendant failed to commit acts in furtherance of the offense. The court of appeal refused rehearing in the matter, with Judge Saunders voting to grant.
This court granted the state's writ to review the court of appeal's determination. After review of the facts and the applicable law, we find that the court of appeal erred in reversing the defendant's convictions and sentence.

LAW AND DISCUSSION
In evaluating the sufficiency of the evidence to support a conviction, a reviewing court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found proof beyond a reasonable doubt of each of the essential elements of the crime charged. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Weary, XXXX-XXXX p. 17 (La.4/24/06), 931 So.2d 297, 310, pet. for cert. filed September 20, 2006 (No. 06-6799); State v. Captville, 448 So.2d 676, 678 (La.1984). The fact-finder weighs the respective credibilities of the witnesses, and this court will generally not second-guess those determinations. State v. Dabney, 2002-934 p. 1 (La.4/9/03), 842 So.2d 326, 327; State ex rel. Graffagnino v. King, 436 So.2d 559, 563 (La.1983) ("It is the role of the fact-finder to weigh the respective credibilities of the witnesses, and this court will not second-guess the credibility determinations of the trier of fact beyond our sufficiency evaluations under the Jackson standard of review."). "However, we are mindful that the touchstone of Jackson v. Virginia is rationality and that `irrational decisions to convict will be overturned, rational decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law.'" State v. Davis, XXXX-XXXX p. 2-3 (La.6/27/03), 848 So.2d 557, 558 citing State v. Mussall, 523 So.2d 1305, 1310 (La.1988) (emphasis in original).
In order to prove that Ordodi was guilty of attempted armed robbery, the state had to prove the elements set forth in La. R.S. 14:64 and La. R.S. 14:27, which provide in pertinent part:
§ 27. Attempt
A. Any person who, having a specific intent to commit a crime, does or omits an act for the purpose of and tending directly toward the accomplishing of his object is guilty of an attempt to commit the offense intended; and it shall be immaterial whether, under the circumstances, he would have actually accomplished his purpose.
B. (1) Mere preparation to commit a crime shall not be sufficient to constitute an attempt; but lying in wait with a dangerous weapon with the intent to commit a crime, or searching for the intended victim with a dangerous weapon with the intent to commit a crime shall be sufficient to constitute an attempt to commit the offense intended.
§ 64. Armed robbery
A. Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon.
The Comments under the attempt article point out that the essential elements of an attempt are "an actual specific intent to commit the offense, and an overt act directed toward that end." See La. R.S. 14:27; Reporter's Comments; see also State v. Murff, 215 La. 40, 53, 39 So.2d 817, 821 (La.1949); State v. Carter, 213 La. 829, 832, 35 So.2d 747, 748 (La.1948).
*661 The state, therefore, had the initial burden of proving beyond a reasonable doubt that Ordodi had the specific intent to take something of value, from another person, using force or intimidation, while armed with a dangerous weapon. "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La. R.S. 14:10(1). Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant. Weary, XXXX-XXXX p. 18, 931 So.2d at 311. The determination whether specific intent exists is a fact question for the jury. State v. Legrand, XXXX-XXXX p. 8 (La.12/3/03), 864 So.2d 89, 96, cert. denied, 544 U.S. 947, 125 S.Ct. 1692, 161 L.Ed.2d 523 (2005); State v. Williams, 490 So.2d 255, 260 (La. 1986), cert. denied, 483 U.S. 1033, 107 S.Ct. 3277, 97 L.Ed.2d 780 (1987).
The eyewitnesses who testified about the defendant's actions were not uniformly certain of the defendant's intent. When Ms. Broussard was asked on cross-examination whether she thought that the defendant was going to come into the bank and try to rob the bank, she replied, "Well, I don't know if I would have gone that far with it, but I knew it didn't look right."[2] At most, Ms. Broussard believed that there was a possibility that the defendant would rob the bank. Ms. Hebert testified that she did not follow the bank's protocol of calling 911 after the defendant left Regions Bank. Instead, she called the main office to find out what she should do, "because [she] didn't want to report someone who [she] shouldn't have."[3] According to Ms. Hebert, "[the defendant] didn't try to rob us. He never asked for money. And I didn't want to turn in somebody who may have been innocent."[4]
Even considering this evidence favorable to the defense, we find that a rational trier of fact could find proved beyond a reasonable doubt that the defendant had the requisite specific intent to commit an armed robbery for both counts of attempted armed robbery. Viewing the defendant's actions in the light most favorable to the prosecution, as we must on appellate review, we find that the defendant, who was despondent and in financial difficulties, armed himself with a loaded weapon and concealed it on his person. He traveled to each bank and entered, armed with a loaded weapon, and carrying a plastic bag. The defendant attempted to conceal his identity by giving a false name at each bank and wearing a baseball cap and sunglasses. The defendant removed the license plate from his truck in order to escape detection. The defendant left his truck engine running while he was inside each bank which would have aided his speedy escape. The defendant left each bank after entering and ascertaining each bank was crowded. These circumstances support the jury's determination that the defendant specifically intended to commit armed robbery.
Having found that the defendant possessed the requisite specific intent to commit armed robbery, we must now review whether sufficient evidence was presented to prove beyond a reasonable doubt to a rational juror that the defendant did or omitted "an act for the purpose of and tending directly toward the accomplishing of his object," sometimes referred to as an "overt act." See La. R.S. 14:27(A) and comments thereto. The attempt statute itself makes a distinction between actions *662 which are "mere preparation," which are not sufficient to support a finding of an attempt, and an act for the purpose of and tending directly toward the accomplishing of his object, which is an essential element of the attempt statute. "Preparation" has been "generally defined as the devising or arranging of the means necessary for the commission of the crime." State v. Pollard, 215 La. 655, 666, 41 So.2d 465, 468 (La.1949).
The difference between mere preparation and an overt act is not precisely defined. The Comments to the attempt statute state "[t]he distinction between preparation and an overt act sufficient for an attempt is one of nearness and degree which defies concise definition, and which can best be approximated by an examination of the jurisprudence." See La. R.S. 14:27, Reporter's Comments. Thus, a defendant's actions which are mere preparation and those which are an act "for the purpose of and tending directly toward the accomplishing of [an] object" may be understood to exist on a continuum.
Where a defendant's actions fall on the continuum is a fact question for the jury or trier of fact. Carter, 213 La. at 833, 35 So.2d at 748 (whether the actions taken by the defendant "amounted to mere preparation or constituted an overt act directed toward the accomplishment of the basic offense was a question for determination by the jury"). In determining whether a defendant's action is an overt act which is an attempt, "the totality of the facts and circumstances presented by each case must be evaluated." State v. Smith, XXXX-XXXX p. 3 (La.10/16/95), 661 So.2d 442, 444; Williams, 490 So.2d at 261. "The overt act need not be the ultimate step toward or the last possible act in the consummation of the crime attempted." Smith, XXXX-XXXX p. 3, 661 So.2d at 444; Williams, 490 So.2d at 261. This court has previously admitted that "the distinction [between actions which are mere preparation and actions which constitute an overt act sufficient for attempt] is one of degree and is dependent on the particular facts of each case." Williams, 490 So.2d at 261. Thus, the determination of a defendant's actions as being mere preparation or acts sufficient to constitute an attempt will be fact specific to each case.
The jury was presented with evidence of several of the defendant's actions taken prior to his entrance into Regions Bank and Bank One. In making the factual determination where those actions fell on the continuum between actions of mere preparation and actions for the purpose of and tending directly toward the accomplishing of his object, the jury found that the defendant had committed actions sufficient to constitute an attempt. In reviewing the evidence of the defendant's actions outlined above, we cannot say that the jury's determination is irrational under the facts and circumstances presented to them. Thus, we hold that a rational juror could find proved beyond a reasonable doubt that the defendant committed an act for the purpose of and tending directly toward the accomplishing of armed robbery.
The jury was instructed that an attempt was also proved when a person searched for an intended victim with a dangerous weapon with the intent to commit a crime. See La. R.S. 14:27(B)(1); see also Murff, 215 La. at 53, 39 So.2d at 821 (". . . the article makes it clear that . . . searching for the intended victim with a dangerous weapon with the intent to commit a crime are in themselves overt acts, especially recognized by the statute, and shall be sufficient to constitute an attempt to commit the offense intended."). Viewing the evidence in the light most favorable to the prosecution, the defendant, while armed with a dangerous weapon, entered two different *663 banks after committing several acts from which specific intent to commit an armed robbery could be found. The defendant left both banks after appearing nervous and distracted. The jurors heard evidence that both banks the defendant entered that morning were crowded. A rational juror could have found proved beyond a reasonable doubt that the defendant entered those banks with the specific intent to rob their employees of the valuables which were in their immediate control, but moved on in search of another bank whose employees he perceived were easier to rob.
The defendant relies on State v. Pollard, 215 La. 655, 41 So.2d 465 (La. 1949) for the proposition that "in order to constitute an attempt there must be an act which tends directly toward the commission of the crime which will apparently result in its commission unless frustrated by extraneous circumstances." Id., 215 La. at 666, 41 So.2d at 468 (emphasis added). Contrary to the defendant's argument, there is no statutory requirement that the defendant's actions be thwarted by extraneous circumstances. "There is no language contained in the statute which would warrant the Court in deducing that frustration of the consummation of the intended offense by extraneous circumstances is an ingredient of an attempt." State v. Porter, 249 La. 784, 789, 191 So.2d 498, 500 (La.1966). In this way, Louisiana's attempt statute "is broader than the common law connotation of an attempt." Id., 249 La. at 788, 191 So.2d at 500.
In fact, this aspect of the Pollard decision was expressly denounced by this court in Porter, wherein the court found "the language used in the Pollard case was not necessary to the decision" and "the Court [in Pollard] gratuitously added the observation, which we now hold to be erroneous, that in order to constitute an attempt there must be an act which not only tends directly towards the commission of the crime but which will apparently result in its commission unless frustrated by extraneous circumstances." Id., 249 La. at 789 n. 3, 41 So.2d at 500 n. 3 (emphasis added).[5]
Nor is the defense aided by the defendant's argument that, if he had specific intent to commit armed robbery, he voluntarily withdrew by leaving the banks prior to demanding money. As this court noted in a case involving the charge of attempted aggravated rape, "[e]ven if he voluntarily withdrew, he did so at a point in time after culpability for an attempt had already attached." State v. Parish, 405 So.2d 1080, 1089 (La.1981) (on rehearing). Citing Porter, supra, this court in Parish found that "whether the defendant voluntarily withdrew or was merely frustrated in his attempt, . . . is not dispositive of the question of culpability." Parish, 405 So.2d at 1089, n. 2. Culpability is a fact question for the jury.
*664 Viewing the evidence in the light most favorable to the prosecution, a rational finder of fact could have found proved beyond a reasonable doubt that the defendant had specific intent to commit armed robbery and committed an act for the purpose of and tending directly toward accomplishing his goal. The court of appeal erred in holding otherwise. We must reverse.

DECREE
For the foregoing reasons, the judgment of the court of appeal is reversed. Defendant's convictions and sentence are affirmed.
CALOGERO, C.J., and KIMBALL, J., dissent and assign reasons.
CALOGERO, Chief Justice, dissenting.
I dissent from the majority's conclusion that a rational finder of fact could have found beyond a reasonable doubt that the defendant had possessed the specific intent to commit armed robbery and also committed an act for the purpose of and tending directly toward accomplishing his goal. The evidence presented by the state in this case, as the court of appeal rightly found, is insufficient under the standard articulated in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), to establish beyond a reasonable doubt that the defendant is guilty of attempted armed robbery of the bank employees named in the bill of information. Neither the defendant's actions, outside and inside the banks, nor his personal financial and marital histories were sufficient to be construed as constituting specific intent to commit armed robbery. Moreover, none of the defendant's actions can be rationally deemed as overt acts for the purpose of and tending directly toward the completion of the offense of armed robbery; indeed, none of the defendant's acts or omissions, in my view, went beyond mere preparation. "Mere preparation to commit a crime shall not be sufficient to constitute an attempt. . . ." La.Rev.Stat. 14:27(B)(1).
KIMBALL, Justice, dissenting.
I dissent from the majority's determination that a rational finder of fact could have found beyond a reasonable doubt that the defendant had specific intent to commit armed robbery and committed an act for the purpose of and tending directly toward accomplishing his goal. In my view, the evidence presented was insufficient to allow a rational juror to conclude beyond a reasonable doubt that defendant possessed both an actual specific intent to commit the offense, and performed an overt act directed toward that end.
Defendant's actions, as shown by the state's evidence presented at trial, cannot properly be construed as anything other than mere preparation to commit the crime of armed robbery. Commentators have explained the attempt to commit a crime as follows:
For a man to make up his mind to commit a crime, and to make preparations to commit it, is not an attempt. He must go further than mere preparation, and do some act directly tending to a carrying out of his unlawful intent. Procuring or loading a gun, or buying poison, or walking to a particular place, with intent to kill another, is not enough to make one guilty of an attempt to commit murder. The same is true of similar preparations to commit burglary, or robbery.
CLARK & MARSHALL, A TREATISE ON THE LAW OF CRIMES 248-49 (Marian Quinn Barnes, ed., Callaghan & Co. 7th ed.1967) (1927).
In the instant case, defendant committed no act directly tending toward carrying out the crime of armed robbery. He made no *665 threats toward anyone, he never demanded anything of value from anyone, he did not produce or brandish the gun inside the banks. Defendant never acted in a way suggesting he intended to rob either bank. In fact, eyewitnesses were uncertain whether defendant was going to rob the bank. The majority speculates that "defendant left each bank after entering and ascertaining each bank was crowded," At 661, but the state submitted no evidence suggesting that defendant was concerned by the number of people present in the bank or that he went to the second bank in hopes it would be less crowded.
The evidence presented by the state shows only that defendant made preparations to commit armed robbery. Defendant's actions of removing his license plate, leaving his truck running in the parking lot, loading and concealing the gun,[1] carrying a plastic bag, and wearing a baseball cap and sunglasses constitute preparation to rob a bank. None of these actions tend directly towards the commission of armed robbery.
Because the totality of the circumstances do not establish beyond a reasonable doubt that defendant committed an act in furtherance of committing the crime of armed robbery, I do not believe a rational juror could have concluded defendant was guilty of attempted armed robbery. Consequently, I dissent from the majority's decision to reverse the judgment of the court of appeal.
NOTES
[1] The bill of information named as victims the individual bank employees with whom Ordodi came into contact. Thus, in count 1, the defendant was charged with attempted armed robbery of Marla Hebert and/or Marella Guidry, the employees at Regions Bank. In count 2, the defendant was charged with attempted armed robbery of Shelly Hughes and/or Tiffany Thibodeaux, the employees of Bank One. See Vol. 1, p. 25.
[2] Vol. 2, p. 322.
[3] Vol. 2, p. 337.
[4] Vol. 2, p. 339.
[5] The transcript reveals that the trial judge included in his jury instructions the erroneous language from Pollard:

Preparation has generally been defined as the devising or arranging of the means necessary for the commission of the crime, while an attempt requires an act which tends directly towards the commission of the crime, and which apparently results in its commission unless frustrated by extraneous circumstances. Vol. 3, p. 442.
As this court stated in Porter, supra, the emphasized portion of the instruction is not a correct statement of the law. However, inclusion of this language in the jury instructions did not prejudice the defendant, since any inference from this erroneous language would be favorable to the defendant. Even with this language favorable to the defense, the jury found the defendant guilty on both counts of attempted armed robbery.
[1] Defendant was not charged with the crime of illegally carrying a weapon.